Thank you, Your Honor. May it please the Court. My name is Greg Gilchrist. I'm here with my colleague, Gia Sinconi, and our client, Tom Mondo, the Worldwide Director of Intellectual Property for Levi Strauss. Your Honor, we're making one claim in this appeal. Are you wearing your Levi's? There was some suggestion that I ought to. But we are making one claim in this appeal, and that is that the District Court and other district courts throughout this circuit, Your Honors, are making errors in severely and categorically limiting the application of the Trademark Dilution Revision Act, which we're calling the TDRA in our briefs. By applying a rule that requires for there to be dilution, there must be identical or nearly identical marks. The rules, an artifact of prior case law that was decided under the Federal Trademark and Dilution Act. Well, actually, it's an artifact, but it has a current history in at least two of our opinions post-TDRA. So since you're speaking to a three-judge panel, perhaps you could address the extent to which we are free to adopt a different standard than was assumed and, whether you call it dicta or not, assumed as still viable in Perfume Bay and the case after that. Certainly, Your Honor. And it looks to some degree as though we're touching on a bit of a touchy subject among the different panels in the Ninth Circuit. And certainly, we're not here arguing that one panel is free to categorically ignore decisions that are made by prior panels. There is some discussion. It appears that Judge Kaczynski and Judge Tashima are the leading proponents, where one judge is looking about whether a decision was necessary to a prior panel's ruling. And the prevailing rule now seems to be whether or not a decision was germane to a prior panel's ruling. But here, that subject really doesn't matter because it's clear, even from the unblocked decision in the Johnson case, where Judge Tashima on the one hand and Judge Kaczynski on the other are looking at it, if you look at footnote 5 in that Johnson case, they talk about how a mere statement of law with a citation to it is to be considered an unreasoned decision. That is not necessarily to be looked at as binding by a subsequent panel. There's another decision. I don't want to leave Judge Reimer's prior decisions out of this morning's discussion. She, in a panel of this Court, indicated that where it's clear that an argument has not been briefed or argued before a panel, that that is not a binding decision that subsequent panels have to look at. Now, with those rules in mind, if we look at what happened in the Giada Toys case, it's absolutely clear that these issues were not briefed or argued because we've looked back at the briefing and all of it predates the adoption of the TDRA. The Perfume Bay case, and we actually have the lawyer here that tried that case, tried that case before the TDRA was adopted. We've reviewed the transcript of the Giada Toys case. There's no mention of the TDRA in it. What happened in the Giada Toys case is simply that the Court looked at whether or not, well, the Court was reaching out in the Giada Toys case to apply the TDRA because otherwise it would be giving no guidance to the lower court. There's nothing in the opinion that suggests that anyone raised the issue of whether this change in language had had a bearing on this identicality standard. The Court made its reference, just a single statement of law with a citation, all to case law that preceded the adoption of the statute, and it did so because the FTDA, and ironically it was ruling that it was to disregard a decision of a prior panel that said that the FTDA should be applied retroactively. The Court was applying the TDRA because that was the only statute that could apply retroactively to Mattel's claim. And so it was not, and it was never presented. No one discussed it. No one raised it. The same thing is true of the Perfume Bay case. In that case, the Court was deciding the case entirely under State law. State law had previously been determined to be equal to the old Federal Dilution Act, and all the Court was doing in the footnote there was about the TDRA was saying that distinctiveness and similarity are important factors that we should consider, and it made a determination that the TDRA's factor test should bolster the decision to give weight to the distinctiveness of the mark in determining whether dilution was likely, but under the State statute. So it wasn't germane or necessary to the ruling in Perfume Bay.  MS. GOTTLIEB Well, Chris, assuming, even assuming you're right on all that, there, it's, you could look at the district court's opinion in other places and say, ah, well, the district court, in fact, did apply the factors that are set out in the TDRA and came to an independent conclusion on them. So the error, if any, is harmless. What is your response to that? Well, Your Honor, the rule in my circuit is that for a legal error of this kind to be harmless, there's a presumption that it's not harmless unless it can be shown by the appellee that the outcome would have been the same. And I think if you look at Judge White's decision, and certainly he does go through the factor test in a sort of quick way after he's rejected our claim on grounds that it's not identical, the standard of identicality permeates his analysis of whether the marks are similar, and it also has tainted his analysis of whether or not there's evidence of actual confusion because he criticizes the survey that we gave, but when he's discussing the survey, he's clearly searching for whether or not the survey has demonstrated that consumers perceive the marks to be identical or nearly identical. He also is looking at whether or not the controls that were used were similar enough, and if all we needed to show was that the marks were similar in order to make our dilution claim, his criticisms may have had a different effect. The Starbucks decision in the Second Circuit, which has now squarely addressed this issue, as far as I know it's the only appellate decision on this point, the Starbucks court had exactly the same kind of district court ruling in front of it. The judge there had ruled that as a threshold matter under Second Circuit law, he needed to find that the marks were substantially similar before he could go on, but he did go on and decided that under the factor test there was no likely dilution and balanced the factors much the way that Judge White did in our case, and the Second Circuit felt compelled to reverse and tell the judge to do it over again because the court concluded that it was very likely that the standard of identicality had infiltrated his analysis of the factor test and that the court should be given the opportunity to consider the proper standard and do it over again. There's further indication that Judge White here in this case viewed the identicality standard as important to the factor test because we had an advisory jury in our case, and he instructed the jury in the course of identifying what the factors were that in considering similarity, they should look specifically to the degree to which the marks are identical or nearly identical. So it's clear from his approach to this entire issue, which dominated a lot of the arguments that we had about legal issues in the lower court, it's clear from his approach to the entire issue that he felt that not only did the identicality standard apply at the threshold, it also applied when he was applying the factor test. So given all of that, we think it's very, very difficult that anybody can conclude with certainty what the outcome would have been in this case had Judge White been applying this particular standard, the proper standard under the TDRA. Now, it's interesting when you look at the Giada Toys case because they did make some findings that we think are very useful and important in a considered way where they were looking at the issue. And the one that I'm talking about is the fact that they reversed also on the trademark infringement claim in that case where the district court had concluded that all he needed to consider for granting summary judgment on the infringement claim was whether or not the marks were too dissimilar for there to be confusion. And the Ninth Circuit in Giada Toys states that, no, you can't just look at similarity. If you just look at similarity, you're going to undermine the value of a multifactor test. And the Court states where the subjective impressions of a particular judge are weighed at the expense of other relevant evidence. And the Court's specifically talking about similarity factors. The value of the multifactor approach sanctioned by this Court is undermined. Well, here, the multifactor test that Congress adopted has been completely nullified  Similarity comes in twice. Dilution by blurring is association arising from the similarity. So you have to have a threshold of similarity. That sets it apart from the other factors between a mark. And then in determining whether a similar mark or trade name is likely to cause dilution by blurring, the Court may consider all relevant factors, including the following, the degree of similarity. Now, why is it the other factors seem to follow and distinguish from that? And I'm trying to get your approach to it, because one way to read this seems to be we could adopt or readopt, if you were, in our circuit the notion that the degree of the similarity and the degree of similarity are standard of identical or nearly identical is the precondition, still the precondition, and the degree of similarity would be if it is not perfectly identical, then it's only nearly identical, or even if it is identical, you then look to these other factors to decide, well, so they are identical or nearly identical, but so what? How does it then wind up diluting the mark? And these other factors are ways of assessing that, given the identical, and for example, Starbucks and Sharbox, at an audio level, they're nearly identical. One could approach it that way, and then you could go through the rest of the list and say, well, yes, but. So tell me why our standard basically can't fit, our extent standard that doesn't fit within the construct of the TDRA. Right. There certainly is a definite, excuse me, the entire architecture of the statute did change in the TDRA, and it does define the cause of action, as you said, which is a set of consumer associations, and they limit it to arising from the similarity of the marks, and that's to avoid HP computers are associated with Dell computers, so it's diluting my mark because you're selling computers. But Congress chose the word in that context to be arising from the similarity. It's a species of association, and it's governed by whether or not it arises from similarity. So I would agree with you that there needs to be, based on that language, at least enough similarity between the marks that associations might be born. But the Congress didn't use the word identical. It didn't use arising from the identity or near identity of the marks. It didn't arise from the extreme or very substantial similarity of the marks. It didn't use those words. And when it turned to the factor test, the next layer of analysis, it doesn't use those words either. It talks about the degree of similarity. And all of the other factors may inform the degree of similarity that Congress would think would have consumer, would work on consumers and create consumer perceptions that are likely to impair the distinctiveness of a famous mark. So, for example, in a case involving non-competing goods, you might want to require a high level of similarity. But in another case, where you said on similarity, as you mentioned, with Charbucks and Starbucks, on an auditory level there is some similarity there. On the other hand, there may be meanings that are similar. So you could have Apple computers and Pear computers, and people might draw associations from the similarity of those terms in the sense that they're both fruit. And that might impair the distinctiveness of Apple's mark in the minds of consumers. And you should look to how the other factors work on that decision in order to decide whether dilution is likely in that context. But if you have a categorical rule, which is what this nearly identical rule is, that's not articulated anywhere by Congress in the statute, you've now forbidden the district courts and the parties from making any analysis of these other factors. You've elevated, you've undermined the factor test in a way that's not called for in the statute. It's not with language that's in the statute. And the original standard was not born from that language because that language wasn't even in the prior statute. This identicality standard comes from language in the prior statute that says that an injunction will issue if a mark is used by a junior user before the mark becomes famous. So the locution and the – it's immediately antecedent in that sense to the market. They were determined, it may have been a debatable proposition, but it was determined in the court by the court in Thain that that meant the marks needed to be identical. That language is gone. A little over time, so let's hear what the other side has to say. I'll give you a minute for a rebuttal. Thank you. Yes. Good morning. Your Honors, may it please the Court, my name is Michael Keyes. With me at counsel table are trial counsel and my colleagues, Michael Bettinger and Rachel Davidson. Your Honors, Judge White got it right. He looked at all the evidence. He considered it during the course of the trial. Levi's had a full and fair opportunity to present the evidence that it believes supported its claim of likelihood of dilution, and that evidence was ultimately rejected by Judge White in a reasoned opinion that he issued with findings of facts and conclusions of law. Trademark cases – He operated under a legal standard that arguably isn't the correct standard. Actually, Your Honor, he did operate under the correct legal standard, as this Court set forth in Jada Toys and the eBay case. And that's the issue. Is TDRA perpetuating our standard? How do you explain how that identical, nearly identical standard comports with the language of TDRA? Your Honor, it comports for several reasons. First of all, it's consistent with what the whole notion of dilution means, as this Court has articulated in several cases, starting back as early as the Thain case, that dilution is a cause of action. It's an appropriation. It's actually an assault on the trademark itself, an appropriation of the mark, which this Court has said it means you're appropriating the mark itself, not simply creating some sort of similar mark. That's really a trademark infringement type of analysis and claim. So this Court has historically looked at that issue and has said it's an appropriation. It's also consistent with the legislative history. Congress, in enacting the first – the Federal Trademark Dilution Act and the TDRA, ultimately referred to examples of what it means to dilute. It used the examples Kodak pianos, Buick shoes. I think Schlitz varnish was one of the other ones. These are all exact appropriations of the mark themselves, and that's what Congress has articulated in the legislative history. It's also important to note that in terms of the Trademark Dilution Revision Act, that came about primarily as a result of the Supreme Court's decision in Mosley that said under the old act, you actually had to show dilution, actual dilution. Congress amended the statute to make it clear, no, it's only a likelihood of dilution. And so the statute was really recalibrated and retooled with that in mind, and the legislative history is clear on that. Roberts. Congress was trying to give greater protection? Carvin. It was trying to make it clear that you didn't have to show actual dilution, as the Supreme Court indicated, a likelihood of dilution, similar to a likelihood of confusion under a trademark infringement analysis. And so at the time when that act was amended, the original Dilution Act, every federal court that had looked at it, had looked at the dilution statute, had determined that you need a high degree of similarity. Now, the circuits had all articulated that standard a little bit different. In the Ninth Circuit, it was identical or nearly identical. Fourth Circuit, it was a similar type of articulation.     Now, you can look at that in the second circuit, the first circuit, the second circuit, and so on and so forth. But every federal court that looked at it had determined you need a substantial amount of similarity between the two before dilution kicks in. Why, then, would Congress use the phrase degree of similarity, if it was so clear that it at least had to be substantial, which is what it was in the Second Circuit? I take that as maybe a little more generous than our nearly identical standard. Why would Congress use the term degree of similarity, certainly with respect to the Ninth Circuit? Because the degree would range between identical and nearly identical. That doesn't sound like much of a operating room for a degree of similarity. It seems like strange locution for that. Your Honor, really the reasonable explanation is it's really just taking into account all the various circuit tests that had looked at the issue and had decided, well, it's got to be substantially similar or identical or nearly identical. The fact of the matter is all of those federal courts had determined you need to have substantial amounts of similarity between the two before you have dilution. So I think the most reasonable explanation. Okay. So let's take that. So why does our nearly identical comport with substantially similar? It does comport with it for several reasons, Your Honor. First of all, as you pointed out initially, the statute starts off saying that dilution is defined as an association arising out of the similarity. So similarity is really the sinquanan of a claim for dilution. You need to have that before you can really move on.  proposed a degree of similarity between the two marks. The Inta and Levi Strauss have proposed that in any given case, the degree of similarity can be de minimis, which that certainly does not make sense because if you have a de minimis degree of similarity, this Court has defined de minimis as something that the consumer wouldn't even perceive. And so under their formulation and their understanding of the statute, what they're claiming is that you can virtually have no similarity between the two marks, but so long as the other factors weigh in favor of dilution, well, then dilution would be applicable. What is actually wrong with that? That was the point I was trying to make earlier, which is the subset after little i is degree of inherent or acquired distinctiveness. So if you have not a great amount of similarity, say more than distinctiveness, you might say, well, you look at the distinctiveness. You look at the extent to which the owner of the famous mark is engaged in substantially exclusive use of it. You look at the degree of recognition intended to whether the user of the mark tended to create an association with the famous mark. You look at any actual association, all of which seem directed at saying, well, if it's not identical or nearly identical, it may well be that these other factors would weigh nonetheless in favor of finding dilution. Your Honor, that would be the case. One would say if they wanted to start from the premise of substantial similarity, they could have simply said dilution by blurring is arising from the substantial similarity between a mark. But, you know, I take your point. I'm just having a little trouble trying to shoehorn our standard into the locution. Your Honor, I direct the Court back to the Thain case, because in Thain this Court looked at the Federal Trademark Dilution Act and really looked at the statutory language and looked at also the underlying legislative history and the purpose behind dilution. And it looked at the legislative history and ultimately said we need to have it be identical or nearly identical. And we submit that if you look at the legislative history for the Trademark Dilution Revision Act, you'll come to the exact same conclusion. What in their ñ I mean, they called out three areas where they were specifically made clear what they were intending to address. Is there anything that explains the choice of degree of similarity language? Do they call out the ñ as you said, you know, the circuits have a working assumption that it has to be at least substantial, and we're content with that, or we're just inferring it from silence? Your Honor, it's really taking the fact that all the Federal courts that had dealt with the issue had come up with this higher degree of similarity standard, and nowhere in the legislative history does Congress ñ was there any testimony saying, Congress, you need to reexamine what the Federal courts have done here on this particular issue? There's no mention of it whatsoever. And as a matter of fact, there's a couple of statements by Representative Behrman, for example, that said dilution arises from appropriation or use of the famous mark, which shows that really Congress was dealing with an appropriation of the mark. But, Your Honors, we submit that irrespective of how the Court ultimately comes out on the legal issue, it doesn't make a difference on this record, and here's why. Judge White went through, he listened to all the evidence at trial, he listened to the exact same evidence that the jury listened to, and he ultimately rejected the claim of dilution. And he looked at each one of the six factors, and he carefully weighed the evidence, he assessed the credibility of the witnesses, he looked at competing expert testimony, and he ultimately said, Levi's failed to prove its case, it's not entitled to injunctive relief. So I'd point the Court specifically to page 18 of the record, and that is the finding of fact where Judge White looks at the nearly ñ the degree of similarity factor. And he states, and I quote, ìFor the reasons set forth above, the Court finds that the rule designs and the arcuate mark are not visually similar.î So that is not going to change. He's already made the determination that there's no visual similarity between the two, and that finding is supported by substantial evidence. On page 13 of the record, what the judge noted is that you've got the Levi's arcuate, it's on the back pocket, it's a symmetrical arch, it meets in a point in the middle. He contrasted that to the rule design. He said the rule design is an embroidered R with the legs extending out, it's flipped upside down, it creates this mirror image as you look at the backside of the jeans. And importantly, he pointed out, the central design element of the rule design is what he referred to and what we all refer to at trial as the dipsy doodle or this infinity loop, which is the central component of the rule design. And because of that, he ultimately said, these designs are not virtually similar. So irrespective of what the legal test is, whether it's identical or nearly identical or something less than that, the fact of the matter is, these marks are not visually similar, and that's not going to change. He also looked at the evidence of intent, and he said, I find the testimony of Mr. Mark Breitbart, he was the fellow that was in charge of the rule design team, he said that I find his testimony credible that they did not intend to create an association between the rule design and the Levi's design. He also looked at the evidence on actual association, and this is important because there was competing expert testimony, and Judge White looked at the evidence, he heard the testimony. On the one hand, you had Levi Strauss's expert, Dr. Sanjay Sood, and he was a relatively new professor at UCLA, had never conducted a consumer survey for a Lanham Act case before. This was his maiden voyage. On the other hand, you had Abercrombie and Fitch who presented the expert testimony of Dr. Gerald Ford, really a veteran of consumer surveys in litigation context, and he went through and thoroughly criticized Dr. Sood's methodology and approach. And importantly, what Judge White ultimately found on that score? This is page 13 of the record. The court finds that Dr. Ford's testimony and critiques persuasive and more reliable than the testimony and survey evidence offered by Dr. Sood. Accordingly, the court finds that Dr. Ford's testimony should be given more weight than Dr. Sood's testimony. Your Honors, Judge White here is clearly sizing up the evidence.    He's not to put too fine a point on it, but this was a bench trial. No, Your Honor. Well, he had an advisory jury, but it was a bench trial. And wouldn't if the interpretation of the statute changed, would it take him more than 10 minutes, if you're right, to come out the way you say he inevitably would? Your Honor, there was a jury trial. It was advisory with respect to the dilution claim, but the jury actually tried and considered all the evidence on the unfair competition and on the trademark infringement claim. I understand that, but we're not talking about that. We're talking only about the dilution claim. Right. I mean, I just want to be sure I'm not missing something. It seems to me like if you're right that he would come out exactly the same way, well, he would just come out exactly the same way, wouldn't he? Well, Your Honor, he did come out the same way as the jury. He thoroughly rejected all of the evidence. I'm not talking about the jury. Okay. I'm sorry, Your Honor. I apologize. I'm not sure that I'm understanding the Court's question. He does not need a jury to make this decision, right? Correct. Okay. So if you're correct that he would come out exactly the same way, even under a similarity rather than an identicality standard, he would just do that, wouldn't he? That's called a lifeline. Yes, Your Honor. How many mobs do I have to get? Thank you, Your Honor. Thank you. Yes, I'll accept that lifeline graciously. Yes, I think that's absolutely correct, Your Honor. I apologize for not understanding the Court's question. Not all questions are hostile. I know I'm running short on time, but I just want to briefly conclude here that the last two factors Judge White found, even if the degree of distinctiveness and degree of recognition are in favor of Levi Strauss, he said, I find that the other factors outweigh those in the final analysis. So at the end of the day, it doesn't matter what the legal standard is. Judge Reimer just made that point. Right, right, right. You don't have to use it the whole time. I won't, Your Honor, so I'm going to sit down. We're just asking for this Court to affirm Judge White's decision, and thank you very much. We assume that coming in. Thank you. Thank you, Your Honor. I'll try to be very brief. You asked, Mr. Keys, how the standard that's been adopted by Judge White in his decision comports with the TDRA. And first he told you it comported with the history of dilution. Then he told you it comported with Thane. Thane is a case that was decided under the prior statute. And then he went back to the history. There's not been a lot of argument about how similar, as it's used in the statute, actually comports with nearly identical. It's operating in this statute the way the Ninth Circuit has interpreted it in the district courts in the circuit as a bar. Right. So what's your answer to Judge Reimer's? Well, as I understood Judge Reimer's question, her question was, if we conclude Judge White got it wrong on the standard, perhaps because of Jada Toys, that we can send it back, give him the right standard, and if he believes that Mr. Keys is right based on the evidence that he heard and his resolution of the credibility of the witnesses, then he can decide very quickly without any jury that we lose again. And I think I agree with that. We'll certainly make some arguments about what he ought to be considering, because the evidence that Mr. Keys read you or the ruling that Mr. Keys read you left out something. He said when he was looking at the similarity of the marks that he was considering whether or not they were essentially the same in application of that factor test. It says it right in the very paragraph in the immediately prior sentence. So we want you to reverse this decision. And I'll say this. Even if you believe for some reason that this case should not go back and be decided by a judge, I would encourage the panel to make a clear ruling, give some guidance to the district courts about this question, because this comes up a lot. It's very important. You have into here. That's why they're here. This is an important issue for brand owners and trademark practitioners. We understand that. The question is whether we're bound by prior cases. But we started with that. We'll finish with that. And we thank you all. Thank you. Case argued is submitted.
judges: Ripple, Rymer, Fisher